a

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

RICHARD A. SEATON, JR.,                CIVIL ACTION NO. 5:17-CV-1556-P
Petitioner

VERSUS                                 JUDGE ELIZABETH E. FOOTE

WARDEN JERRY GOODWIN,                  MAGISTRATE JUDGE PEREZ-MONTES
Respondent

## REPORT AND RECOMMENDATION

Before the Court is a Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 (Doc. 1) filed by Petitioner Richard A. Seaton, Jr. ("Seaton") (#595392). Seaton is an inmate in the custody of the Louisiana Department of Corrections, incarcerated at the David Wade Correctional Center in Homer, Louisiana. Seaton challenges his convictions of forcible rape and abuse of office.

Because Seaton does not show that the state courts' rulings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings, his Petition (Doc. 1) should be DENIED and DISMISSED WITH PREJUDICE.

## I.    Background

Seaton, the former assistant chief administrative officer for the City of Shreveport, was convicted of forcible rape and abuse of office.   The facts of the case are summarized by the Louisiana Second Circuit Court of Appeals as follows:

On December 27, 2010, K.W., an 18–year–old high school senior, attended the Independence Bowl held in Shreveport with her mother, Kimberly Barnes, her boyfriend, David Barnhill, and her grandparents. They were Florida residents who were staying at the Sam's Town Hotel. The evidence contained in the record established the following events: K.W. probably consumed two 16–ounce cups of Jack Daniels and soda before the game and two beers during the game. After a disagreement with a person sitting behind them, K.W. and Barnhill left the stadium and began arguing with each other. Several officers saw the commotion and asked if K.W. was alright. A short time later, the officers arrested K.W.'s boyfriend after he refused to follow their instructions. K.W. pleaded with the police not to arrest her boyfriend, but the police stated that he would be taken to the Shreveport City Jail and gave K.W. his cell phone.

Corporal Ernest French, an employee of the Caddo Parish Sheriff's Office, was working that evening outside the stadium. He testified that K.W. was a short female with dark hair, a small frame and had a "strong odor of alcohol on her breath." Corporal French testified that he saw defendant at the scene helping with the shuttle buses. French stated that the defendant was tall and wore a dark trench coat. Corporal French testified that after the arrest of K.W.'s boyfriend, the defendant touched French's shoulder and stated, "I can do something with that, she's cute. I'll take her on." Corporal French did not ask who defendant was referring to, but K.W. was standing nearby.

Shreveport Police Sergeant Keith Grant was supervising shuttle routes at the bowl game. Sgt. Grant testified that he was aware the defendant was the city's contact person with authority regarding the operation of the shuttle routes. Sgt. Grant spoke with K.W. after her boyfriend's arrest. He described her as a young woman who appeared to be 18 years of age, with a petite build, an approximate height of five feet and weight of 115 pounds. Sgt. Grant stated that she was upset and wanted to go to the jail to get her boyfriend released. Sgt. Grant attempted to help K.W. by advising her to ride the shuttle bus back to Sam's Town. He also explained the booking process to her, but testified that she did not understand the process and kept repeating his words out loud to herself. Sgt. Grant testified that he told defendant that K.W. needed a ride, and the defendant stated that he could get her back to Sam's Town. Once K.W. was seated on the shuttle, Sgt. Grant was under the impression she was returning to the hotel and he walked back to his assigned area. However, a short time later Sgt. Grant saw defendant driving K.W. away in a golf cart and was surprised because he thought she was going back to her hotel.

Charles McDuff, an operator of one of the shuttle buses, testified that defendant coordinated and supervised the shuttle buses. McDuff testified that at some point during the evening he saw that K.W. was "hollering and screaming," that he could smell alcohol on her and that he believed she had been drinking based on her actions. McDuff testified that he overheard K.W. refer to defendant as "Officer Rick" and defendant said he was not an officer, but was an administrative officer for the City. However, when McDuff interjected to tell K.W. that defendant was not an officer, defendant then responded, "Technically, I am." McDuff stated that after K.W. was seated on the bus she again asked about going to the jail and defendant stepped into the bus and asked K.W. if she was going on the bus or with him. K.W. then stood, exited the bus and left with defendant.

The defendant drove K.W. in the golf cart to a city-owned vehicle that he was using for the evening. K.W. testified that defendant placed his hand on her leg while driving her to the city jail. Then, when they arrived at the jail and she attempted to get out of the car, defendant pulled her back inside the car and started kissing her neck. She also stated that she asked defendant to stop during these acts and that she felt uncomfortable.

Jonathan Long, an employee of Louisiana Bail Bonds, testified that he spoke with K.W. at the jail and informed her that his company did not post bonds for out-of-state residents. He testified that K.W. began to cry, and told him that the detective who brought her there had been "touching her inappropriately, rubbing on her, kissing on her" and she had told him to stop. Long testified that K.W. offered him money for a ride, but that he could see she was upset, she was crying and he could smell the alcohol on her breath, so he did not give her a ride because of her condition. Long testified that when he walked out to the parking lot, the defendant asked him if he had been able to help K.W. and Long told defendant that he was unable to help her.

Surveillance footage from the waiting room of the jail shows defendant entering the building (after being buzzed in), standing over K.W., and motioning for her to leave with him. Defendant is also seen taking the list of the local bail-bonding companies and walking toward the door.

K.W. testified that she was crying and upset, that she told defendant that she needed to use a phone and go to an ATM, and that defendant stated that they were going to his office to use the phone and an ATM nearby. She stated that defendant never told her that he was carrying

a cell phone with him at the time.  After arriving and parking in the garage of Government Plaza, defendant used his access card to enter the building and the mayor's office suite, a secured area on the second floor.

K.W. testified that she knew she was in defendant's office because of the plaque on his door and the name in front of his seat.  According to K.W., defendant started rubbing her back again and feeling underneath the layers of her clothes. K.W. testified that she asked defendant to stop, but that he grabbed her and pulled her onto his lap and began to feel her stomach. She testified that she attempted to move away, but that defendant held her down. During these acts, K.W. testified that she told him to stop.

The defendant then asked K.W. if she had ever seen a mayor's office before.  K.W. testified that she wanted to go to the mayor's office because she was hoping that more people would be around and that there would be a video camera present to prevent defendant from touching her. He used a card to enter the mayor's office, which was secured by an electronic security system that required a key card to gain access.  Upon entry, K.W. saw a bowl of lollipops and placed one in her pocket.  She testified that defendant made sexual comments referring to the lollipop. K.W. testified that she asked to use a bathroom she had seen in the hallway of the second floor, but that defendant told her to use the bathroom in the mayor's office.

While in the bathroom of the mayor's office, K.W. sent the following text to her boyfriend: "Tell the police that officer john rape me baby plz I ll do anything for u but I can't fk this man no more."  K.W. testified that she had forgotten she had her boyfriend's phone, which began to ring. K.W. then began to flush the toilet to drown out the ringing sound. She also sent her mother the following texts: "Mom ny5 fone die e im at mayor offic2e downtoen officer seaton helppppp," and "mom, his name is rick seston." K.W. testified that she sent these texts because she was afraid she would be raped and killed.

K.W. testified that as she exited the bathroom defendant grabbed her, pushed her against the wall and began kissing her neck.  She stated that she told him to stop, but that she was unable to fight him off. The defendant then pushed her onto the couch in the mayor's office and began undressing her.  She testified that her belly button ring was caught in her pants and was ripped out when defendant pulled down her pants.  K.W. testified that she told defendant that she was on her menstrual cycle, but he pulled out her tampon and performed oral sex

4

upon her.   K.W. testified that she repeatedly told defendant no and asked him to stop.

After defendant finished, K.W. testified that he told her not to go anywhere and left the room.  She stated that when he returned a minute later, she could smell a "latex glove" scent that indicated he was wearing a condom.  The defendant then vaginally penetrated her while she was on the couch.  K.W. testified that defendant next turned her onto her stomach and vaginally penetrated her again.

K.W. testified that she was visibly upset afterwards. She then followed defendant to the ATM outside the building.  They returned to the mayor's office to try to find her underwear and then defendant drove her to Sam's Town.  K.W. testified that she had memorized the car's license plate number while in the parking garage.  After being dropped off, she immediately went to a bar in the casino for a pen to write down the number.

K.W. was met in the hotel lobby by her mother and police officers. Her mother had received the texts and had filed a missing person report. Shreveport Police Officer Matthew Holloway testified that K.W. was crying and told him that defendant had raped her in the mayor's office. She also handed him a piece of paper containing the license plate number and description of the city vehicle used by defendant.

Officer Tracy Mendels, an investigator for the Shreveport Police Department Crime Scene Investigations Unit, was called to Government Plaza and advised to look for a belly button ring.  Mendels photographed, marked and collected evidence from the offices. The following evidence was secured from the mayor's office: two DNA swabs from the couch cushion; one tape lift of long dark hair from the couch cushion; and one throw pillow from the couch with suspected bodily fluids. The following evidence was secured from the home of defendant's father, with whom defendant was staying: a blue shirt and charcoal gray pants; a tube of sexual lubricant; two sex manuals; and a number of condoms. K.W.'s belly button ring, underwear, and tampon were never recovered.

Melanie Hubbard, an expert in the field of sexual assault forensic examination, testified that on December 28, 2010, she arrived at Schumpert Hospital after 1:00 a.m. and performed a sexual assault examination on K.W. Hubbard testified that K.W. was very upset and nervous with alcohol on her breath, that her eyes were bloodshot and she was crying.  Hubbard testified that K.W. said she had consumed two

alcoholic drinks and gave the details about her boyfriend's arrest, the unwanted advances from defendant, her attempts to contact her mother and boyfriend, and the rape.

The medical examination revealed that K.W. had four "slits," or lacerations, at the bottom of her posterior fourchette (vaginal opening). Hubbard stated that such slits were different from the norm and indicated "rough intercourse," which could have occurred with or without consent. Hubbard also testified that the dried secretions and blood in K.W.'s navel and the brown fluid around her cervix were consistent with K.W.'s narrative of having a body piercing and menstruating.

Jimmy Dale Barnhill, an expert in the area of forensic alcohol toxicology at the North Louisiana Criminalistics Laboratory, testified that test results showed K.W.'s blood alcohol level as .05 grams at 1:30 a.m. or 2:00 a.m. on December 28, 2010. Based upon the victim's size, body weight and using "retrograde extrapolation," Barnhill opined that K.W.'s blood alcohol level would have been somewhere between .11 and .16 grams percent at 8 p.m., and between .10 and .15 grams percent at 9 p.m.

Gerald Posey, a deputy and the Technical Resources Manager of the Caddo Parish Sheriff's Office, testified that the security cameras installed at Government Plaza were operated by the sheriff's office. He stated that five of the security camera videos from the evening of the crime had been deleted from the video index. However, Posey testified that he was able to access the video, which was stored on the system server.

Dale Sibley, Chief Administrative Officer of the City, testified that the defendant was fired on the evening of the incident because of his behavior, his use of the mayor's office and a city vehicle. Sibley testified that defendant made the following statements to him, "I guess I kind of messed up ... I didn't rape anybody ... And I think when all this is said and done, that will be clear. As a matter of fact, you know, I used a condom and it's in the trash can."

The defense called Dale Thomas, an employee for the City of Shreveport, as an expert in the field of Information Technology. Thomas stated that only his office had access to the log report of the key-card security system and that he believed that no city worker had the necessary software to delete the video in the sheriff's system. Specifically, Thomas stated his belief that defendant was granted only

6

"viewer rights," not "administrative rights," and so would have been unable to delete any videos.

The defendant testified that at the time of the incident, he was employed as the Assistant Chief Administrative Officer of Shreveport. He testified that on December 27, 2010, he was not armed with a firearm and wore charcoal gray pants, dark blue shirt, yellow tie, a black trench coat and an Independence Bowl lanyard pass around his neck. He testified that he observed the arrest of K.W.'s boyfriend and was standing close to the police officers on the scene, but that he never indicated to K.W. that he was a police officer or that he was able to post her bond.

Defendant testified that he offered K.W. help by giving her the choice to ride with him to the city jail. He stated that he and K.W. kissed each other in his car outside of the jail and that he did not force himself upon her or threaten her. Defendant testified that while waiting in the parking lot he spoke with Long about K.W. posting a bond and that he was told that she could not be helped because she was from out of state.

Defendant testified that he then drove K.W. to Government Plaza to use the ATM and the phone, and that he used his access card to enter the building. He testified that K.W. sat in his lap while making phone calls, that he rubbed her back, that they went into the mayor's office and that K.W. went to the bathroom. He asserted that they each took off their own clothes and had sex twice on the couch in the mayor's office. Defendant stated that K.W. did not tell him to stop, that he did not threaten her and that he used a condom. He testified that he had not deleted any videos and that he had access to view the videos only.

On cross-examination, defendant theorized that K.W. was lying about being raped in an effort to get leverage against the city to get her boyfriend out of jail. He admitted telling Corporal French that K.W. was attractive, but asserted that she did not have slurred speech or an odor of alcohol at the time.

Defendant testified that he told K.W. that the bus ride would not cost anything because the bus operator was working for him, and that he had exerted authority over the bus driver with the police standing there. He also testified that he did tell K.W. that he was something like an officer in that he was the Assistant Chief Administrative Officer for the city. Defendant acknowledged that he could have taken K.W. to Sam's Town or let her use one of his two cell phones to call bail bonding agencies instead of driving her to his work office after hours. He testified that he

did not know how K.W.'s belly button piercing was ripped out and did not see a tampon.

State v. Seaton, 47,741 (La.App. 2 Cir. 4/10/13, 1–11); 112 So.3d 1011, 1013–18, writ denied, 2013-1056 (La. 11/15/13); 125 So.3d 1102.

Seaton was sentenced to a total of 15 years of imprisonment, the first three to be served without benefits. See State v. Seaton, 47,741 (La.App. 2 Cir. 4/10/13); 112 So.3d 1011, writ denied, 2013-1056 (La. 11/15/13). Seaton appealed raising sufficiency of the evidence, double jeopardy, and excessive sentence. His conviction and sentences were affirmed. Id.

Seaton filed an application for post-conviction relief, in which he raised ineffective assistance of counsel claims and a violation of Brady v. Maryland, 373 U.S. 83 (1963) (Doc. 9-8, pp. 74-79). The trial court denied relief, finding that Seaton had not met his burden of proof of ineffective assistance under Strickland v. Washington, 466 U.S. 668 (1984), or established any of the requirements under Brady. (Doc. 9-8, pp. 176-178). Supervisory writs were denied. State v. Seaton, 2016-1061 (La. 11/6/17); 228 So.3d 738; (Doc. 9-9, p. 9). Seaton raises the two post-conviction claims in this § 2254 Petition. (Doc. 1).

II.    **Law and Analysis**

A.    **Rule 8(a) Resolution**

The Court is able to resolve Seaton's § 2254 Petition without the necessity of an evidentiary hearing because there are no genuine issues of material fact relevant to Seaton's claims, and the state court records provide an adequate factual basis. See

8

Moya v. Estelle, 696 F.2d 329, 332-33 (5th Cir. 1983); Easter v. Estelle, 609 F.2d 756, 761 (5th Cir. 1980); Habeas Corpus Rule 8(a).

B.   **Standard of Review**

An application for writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall be considered only on the ground that he is in custody in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a).  The role of a federal habeas court is to guard against extreme malfunctions in the state criminal justice systems, not to apply de novo review of factual findings and to substitute its own opinions for the determinations made by the trial judge.  See Davis v. Ayala, 135 S. Ct. 2187, 2202 (2015) (citing Harrington v. Richter, 562 U.S. 86, 102–03 (2011)).

Under § 2254 and the AEDPA, habeas relief is not available to a state prisoner with respect to a claim that was adjudicated on the merits in the state court proceedings unless the adjudication of the claim: (1) resulted in a decision that was contrary to or involved an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  See Martin v. Cain, 246 F.3d 471, 475-76 (5th Cir. 2001), cert. den., 534 U.S. 885 (2001).

Therefore, § 2254(d) demands an initial inquiry into whether a prisoner's claim has been "adjudicated on the merits" in state court; if it has, the AEDPA's highly

deferential standards apply. See Davis, 135 S. Ct. at 2198 (citing Richter, 562 U.S. at 103).

When a federal claim has been presented to a state court and the state court has summarily denied relief without a statement of reasons, it may be presumed that the state court adjudicated the claim on the merits, in the absence of any indication or state law procedural principles to the contrary. Richter, 562 U.S. at 99. A habeas court must determine what arguments or theories supported, or could have supported, the state court's decision, and then, whether it is possible fair-minded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court. See Richter, 562 U.S. at 102. Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden must be met by showing there was no reasonable basis for the state court to deny relief. Richter, 562 U.S. at 98.

A state court decision is "contrary to" clearly established Supreme Court precedent if the state court applies a rule that contradicts the governing law set forth in Supreme Court cases, or confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from Supreme Court precedent. A state court decision falls within the "unreasonable application" clause when it unreasonably applies Supreme Court precedent to the facts. See Martin, 246 F.3d at 476; see also Rivera v. Quarterman, 505 F.3d 349, 356 (5th Cir. 2007), cert. den., 555 U.S. 827 (2008).

A federal habeas court making the unreasonable application inquiry should ask whether the state court's application of clearly established federal law was objectively reasonable. A federal court cannot grant habeas relief simply by concluding that the state court decision applied clearly established federal law erroneously; the court must conclude that such application was also unreasonable. See Martin, 246 F.3d at 476. An unreasonable application is different from an incorrect one. See Bell v. Cone, 535 U.S. 685, 694 (2002). When a state court determines that a constitutional violation is harmless, a federal court may not award habeas relief under § 2254 unless the harmlessness determination itself was unreasonable. See Mitchell v. Esparza, 540 U.S. 12, 18 (2003); see also Davis, 135 S. Ct. at 2199 (citing Fry v. Pliler, 551 U.S. 112, 119 (2007)).

C. **There was no unreasonable application of federal law as to Seaton's ineffective assistance of counsel claims.**

Seaton alleges that he received ineffective assistance of counsel under Strickland because his attorney failed to effectively cross-examine the victim on certain inconsistencies in her trial testimony; failed to adequately question the victim about prior inconsistent statements; failed to question the victim's mother regarding whether she initially believed that her daughter had been raped; and failed to explore whether Seaton had enough time to find and remove certain pieces of unrecovered evidence from the crime scene. (Doc. 1).

Seaton raised the ineffective assistance of counsel claims in the state courts. The question for this Court is whether the state courts' denial of relief was contrary

to, or an unreasonable application of, federal law as determined by the Supreme Court. The Court concludes it was not.

In Strickland, the Supreme Court established a two-part test for evaluating claims of ineffective assistance of counsel in which the petitioner must prove both deficient performance and prejudice therefrom. See Strickland, 466 U.S. at 697. The petitioner has the burden of proving ineffective assistance of counsel by a preponderance of the evidence. See Montoya v. Johnson, 226 F.3d 399, 408 (5th Cir. 2000); Jernigan v. Collins, 980 F.2d 292, 296 (5th Cir. 1992). In deciding ineffective assistance claims, a court need not address both prongs of the conjunctive Strickland standard, but may dispose of such a claim based solely on a petitioner's failure to meet either prong of the test. Amos v. Scott, 61 F.3d 333, 348 (5th Cir. 1995).

To prevail on the deficiency prong, a petitioner must demonstrate that counsel's conduct failed to meet the constitutional minimum guaranteed by the Sixth Amendment. See Styron v. Johnson, 262 F .3d 438, 450 (5th Cir. 2001). The petitioner must show that "counsel's representation fell below an objective standard of reasonableness." Strickland, 466 U.S. at 687–88. The analysis of counsel's performance must consider the reasonableness of counsel's actions under prevailing professional norms and in light of all of the circumstances. See Strickland, 466 U.S. at 689; Carty v. Thaler, 583 F.3d 244, 258 (5th Cir. 2009). The reviewing court must "judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." Roe v. Flores–Ortega, 528 U.S. 470, 477 (2000) (quoting Strickland, 466 U.S. at 690).

A petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation. Harrington, 562 U.S. at 104 (citing Strickland, 466 U.S. at 689). "[I]t is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight." Bell, 535 U.S. at 697 (citing Strickland, 466 U.S. at 689). As a result, federal habeas courts presume that trial strategy is objectively reasonable unless clearly proven otherwise. Strickland, 466 U.S. at 689; Johnson v. Dretke, 394 F.3d 332, 337 (5th Cir. 2004) (counsel's "'conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness'") (quoting United States v. Jones, 287 F.3d 325, 331 (5th Cir. 2002)); Geiger v. Cain, 540 F.3d 303, 309 (5th Cir. 2008).

In order to establish prejudice, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694; Williams v. Thaler, 602 F.3d 291, 310 (5th Cir.2010). Furthermore, "[t]he petitioner must 'affirmatively prove,' and not just allege, prejudice." Day v. Quarterman, 566 F.3d 527, 536 (5th Cir. 2009) (quoting Strickland, 466 U.S. at 695). In this context, "a reasonable probability is a probability sufficient to undermine confidence in the outcome." Cullen, 131 S.Ct. at 1403 (quoting Strickland, 466 U.S. at. 694). This standard requires a "substantial," not just "conceivable," likelihood of a different result. Harrington, 562 U.S. at 112.

In deciding whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial." Crockett v. McCotter, 796 F.2d 787, 793 (5th Cir. 1986). Thus, conclusory allegations of ineffective assistance of counsel, with no showing of effect on the proceedings, do not raise a constitutional issue sufficient to support federal habeas relief. Miller v. Johnson, 200 F.3d 274, 282 (5th Cir. 2000) (citing Ross v. Estelle, 694 F.2d 1008, 1012 (5th Cir. 1983)).

On habeas review, the United States Supreme Court has clarified that, in applying Strickland, "[t]he question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." Harrington, 562 U.S. at 105. The Harrington Court went on to recognize the high level of deference owed to a state court's findings under Strickland in light of AEDPA standards of review:

> The standards created by Strickland and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so. The Strickland standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

Id. at 105 (citations and quotation marks omitted).

Thus, scrutiny of counsel's performance under § 2254(d) is "doubly deferential." Cullen, 131 S.Ct. at 1403 (quoting Knowles v. Mirzayance, 556 U.S. 111, 123 (2009)). The federal courts must take a "highly deferential" look at counsel's performance

14

under the <u>Strickland</u> standard through the "deferential lens of § 2254(d)." <u>Id.</u> (quoting <u>Knowles</u>, 556 U.S. at 121 n. 2) (citing <u>Strickland</u>, 466 U.S. at 689).

Seaton claims that his trial attorney was ineffective in the way he addressed— or failed to address—the victim's credibility at trial. Counsel's cross-examination of witnesses is generally a matter of trial strategy for purposes of the <u>Strickland</u> analysis. <u>See Castillo v. Stephens</u>, 640 F. App'x 283, 292 (5th Cir. 2016), <u>cert. denied sub nom. Castillo v. Davis</u>, 137 S. Ct. 279 (2016) ("Speculating about the effect of tinkering with the cross-examination questions is exactly the sort of hindsight that Strickland warns against."); <u>accord. Sonnenberg v. Davis</u>, 18-cv-450, 2019 WL 136821, at *6 (W.D. Tex. Jan. 8, 2019). Seaton's attorney cross-examined the victim three times, and cross-examined her mother twice. (Doc. 9-5, pp. 582-24, 586-87, 635-666, 674-677, 678-680). The victim was questioned about inconsistencies and omissions in her statements and testimony. (Doc. 9-5, pp. 647, 649, 653, 656-67, 674-75). Any failure to engage in a more vigorous cross-examination of the victim and her mother falls within a strong presumption of reasonable trial strategy. Such tactical decisions, when supported by the circumstances, are objectively reasonable and do not amount to unconstitutionally deficient performance. <u>Lamb v. Johnson</u>, 179 F.3d 352, 358 (5th Cir. 1999), <u>cert. denied</u>, 528 U.S. 1013 (1999) (citing <u>Rector v. Johnson</u>, 120 F.3d 551, 564 (5th Cir. 1997) and <u>Mann v. Scott</u>, 41 F.3d 968, 983-84 (5th Cir. 1994)).

Although another attorney may have chosen a different strategy, nothing suggests that the alleged errors by Seaton's attorney were so serious that the

representation amounted to "incompetence," or that counsel failed to function as "counsel" as guaranteed by the Six Amendment.  Harrington v. Richter, 562 U.S. 86, 105 (2011); Strickland, 466 U.S. at 690.  Seaton cannot overcome the presumption that, under the circumstances, his attorney's questions to the victim and her mother might be considered sound trial strategy.  Strickland, 466 U.S. at 689.

Giving appropriate deference to the state court's factual findings, and having independently reviewed Petitioner's claim and the state court record, the state court's application of Strickland was not unreasonable.  See 28 U.S.C. § 2254(d), (e).

### D.    Seaton cannot establish a Brady violation.

In denying writs, the Louisiana Supreme Court found that Seaton "fails to show the state withheld material exculpatory evidence" in violation of Brady.  State v. Seaton, 2016-1061 (La. 11/6/17, 1); 228 So.3d 738.   Seaton cannot show this was an unreasonable application of federal law.

In Brady, the Supreme Court held that a prosecutor must disclose evidence to a criminal defendant if that evidence is favorable to the defendant and material to his guilt or punishment.  "Brady claims involve 'the discovery, after trial of information which had been known to the prosecution but unknown to the defense.'" Lawrence v. Lensing, 42 F.3d 255, 257 (5th Cir. 1994) (citing United States v. Agurs, 427 U.S. 97, 103 (1976)).  "There are three components of a true Brady violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State,

either willfully or inadvertently; and prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281–82 (1999).

"Although the State is obligated to disclose evidence to the defense, the State need not disgorge every piece of evidence in its possession. Rather, under Brady, the State has an affirmative duty to disclose to the defense evidence that is favorable to the accused and material to guilt." Rector v. Johnson, 120 F.3d 551, 558 (5th Cir. 1997) (citing United States v. Bagley, 473 U.S. 667 (1985)). Evidence is material within the meaning of Brady only when there is a reasonable probability of a different result at trial had the evidence been disclosed. Wood v. Bartholomew, 516 U.S. 1, 5 (1995).

Seaton argues that the State "failed to disclose, and in fact actively blocked production of," the 911 call by the victim's mother and the "Background Event Chronology" from Officer Holloway's report. (Doc. 14, p. 20). However, the phone call was not "unknown to the defense." Lawrence, 42 F.3d at 257. (Doc. 9-3, pp. 19-20, 121, 127, referencing call from the victim's mother to police). Additionally, the trial court record indicates that Seaton requested copies of audio recordings from the "telephone call from Kimberly Barnes to Shreveport Police Department or E-911." (Doc. 9-3, p. 178). In a spreadsheet provided to the State, Seaton indicated that "audio from phone call from Kimberly Barnes to SPD or E-911 on Monday 27 December 2020" was "filed on 23 September 2011." (Doc. 9-3, p. 182). Regardless, Seaton deemed discovery satisfactory before trial. (Doc. 9-3, p. 2).

The State has no obligation to point the defense toward potentially exculpatory evidence when that evidence is either in the possession of the defendant or can be discovered by exercising due diligence.  See United States v. Mmahat, 106 F.3d 89, 94 (5th Cir. 1997), abrogated on other grounds by U.S. v. Estate of Parsons, 367 F.3d 409 (5th Cir. 2004); Brown v. Cain, 104 F.3d 744, 750 (5th Cir.), cert. denied, 520 U.S. 1195 (1997).  Nor is the State obligated under Brady to disclose evidence that is available from other sources.  See Blackmon v. Scott, 22 F.3d at 560; Rector v. Johnson, 120 F.3d 551, 558 -559 (5th Cir. 1997); see also U.S. v. Sipe, 388 F.3d 471, 478 (5th Cir. 2004).  According to Seaton and the State, the 911 recording and the Background Event Chronology were not in the possession of the State (Doc. 1-1, p. 14; Doc. 9-1, pp. 29-30) and could have been obtained from the City of Shreveport.  In fact, Seaton obtained the underlying documents form the City of Shreveport after he was convicted.  (Doc. 9-8, p. 89).

Moreover, Seaton cannot show that the 911 call and the chronology were material to guilt or punishment.  Seaton argues that:

> The 911 call and the Background Event Chronology would have provided a reference point against which all other clocks/time stamps could have been compared. For instance, if the Background Event Chronology showed an officer arriving at the casino to meet with K.W. at midnight but the hotel cameras showed a time of 12:02, the difference between these two time lines would be established. If the Background Event Chronology showed an officer arriving at City Hall at 12:30 but the City Hall cameras showed a time of 12:35, the difference between these two time lines would be established as would the difference between the City Hall and casino time lines.

(Doc. 1-1, p. 13).

The lack of synchronicity as to time between various devices was thoroughly discussed at trial (Doc. 9-5, pp. 58, 89-90, 92, Doc. 9-6, pp. 78-83, 137-38, 187), and Seaton raised the issue in a "Motion for Post-Judgment of Acquittal" (Doc. 9-3, p. 254) and on direct appeal. Seaton, 112 So.3d at 1018. Even if the text had been sent at a different time, the victim testified at trial that she sent texts about the anticipated rape before it happened, and that Seaton indeed raped her. (Doc. 9-5, pp. 118-119). The judge found her testimony credible and determined Seaton raped the victim.

The chronology does not "put the whole case in such a different light as to undermine confidence in the verdict." Kyles v. Whitley, 514 U.S. 419, 435 (1995). Therefore, Seaton cannot show a reasonable probability of a different result at trial had the chronology been produced.

## III. Conclusion

Because Seaton does not show that the state courts' rulings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings, IT IS RECOMMENDED that the Petition (Doc. 1) be DENIED and DISMISSED WITH PREJUDICE.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), parties aggrieved by this Report and Recommendation have 14 calendar days from service of this Report and Recommendation to file specific, written objections with the Clerk of

Court. A party may respond to another party's objections within 14 days after being served with a copy thereof.  No other briefs (such as supplemental objections, reply briefs, etc.) may be filed.  Providing a courtesy copy of the objection to the undersigned is neither required nor encouraged. Timely objections will be considered by the District Judge before a final ruling.

Failure to file written objections to the proposed findings, conclusions, and recommendations contained in this Report and Recommendation within 14 days from the date of its service, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Judge, except upon grounds of plain error.

Pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts, this Court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. Unless a circuit justice or district judge issues a certificate of appealability, an appeal may not be taken to the court of appeals. Within 14 days from service of this Report and Recommendation, the parties may file a memorandum setting forth arguments on whether a certificate of appealability should issue. See 28 U.S.C. § 2253(c)(2).  A courtesy copy of the memorandum shall be provided to the District Judge at the time of filing.

THUS DONE AND SIGNED in chambers in Alexandria, Louisiana, this

___1st___ day of July, 2019.

_____
Joseph H.L. Perez-Montes
United States Magistrate Judge